# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DAVE STONE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-0747 |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORP., a/k/a IBM CORP., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Plaintiff, Dave Stone, sued his former employer, IBM Corporation, in state court, alleging that he was fired because of discrimination based on either actual or perceived disability following an injury. Stone also alleges that he was fired because of retaliation. IBM removed on the basis of diversity jurisdiction. IBM has moved for summary judgment, asserting that based on the undisputed facts, IBM is entitled to judgment as a matter of law because there is no evidence of a disability; IBM had a legitimate nondiscriminatory reason for its decision to fire Stone (as well as two others who were similarly situated); and there is no evidence of retaliation. (Docket Entry No. 29). Stone has replied.[1] Based on the pleadings; the motion and response; the parties' submissions; and the applicable law, this

---

[1] Stone submitted a response and an amended response to IBM's motion for summary judgment. IBM has moved to strike the amended response because it was not timely filed, (Docket Entry No. 32), and because it did not properly authenticate the attached documents, (Docket Entry No. 33). IBM's motion to strike is denied. Stone's motion to strike IBM's motion to strike, (Docket Entry No. 35), is denied as moot.

court grants IBM's motion for summary judgment and, by separate order, enters final judgment.[2]  The reasons are explained below.

## I.     Background

Stone began working for IBM in May 1996.  In December 2001, Stone was a senior manager in IBM Global Services with the title of Director/Managing Principal, Senior Office Executive.  His primary job responsibility was for contract profitability in the Western Region of the United States.  On December 18, 2001, Stone fell and hit his head in a restaurant bathroom during a business dinner, fracturing his skull.  He took approved Sickness and Accident Leave from December 18 to December 24, 2001, continuing to receive full pay and benefits.  From December 27, 2001 to February 14, 2002, Stone returned to work on a modified schedule, with medical restrictions not to lift more than ten pounds, to avoid operating heavy machinery, and to avoid prolonged reading and looking at a computer screen.  (Docket Entry No. 31, Exs. 1, 3).  Stone was cleared by his doctor to return to work on a full schedule, without limitations or restrictions, on February 14, 2002.  (*Id.*, Ex. 2).  Neither Stone nor his doctor requested that IBM make accommodations for his job performance.

In 2002, Stone was responsible for a fixed-fee IBM contract for Resolution Performance Products (RPP).  The events that led to his firing are related to that contract.

---

[2]  Stone's amended response asks this court to grant him summary judgment on liability and hold a hearing on damages.  (Docket Entry No. 31, pp. ix–x).  In other parts of the amended response, Stone argues that there are disputed fact issues on liability.  Stone has not filed a motion for summary judgment.  To the extent Stone's argument could be construed as a motion for summary judgment, the motion is denied.

On May 23, 2003, one of IBM's employees working on the RPP contract, Tamara Boose, sent an email to IBM's Chairman.  (Docket Entry No. 29, Ex. 3, Boose Decl.; *id.*, Ex. 2-A, Email from Tamara Boose).  In the email, Boose asserted that she and other employees had been told not to record the hours that they were in fact working on the contract.  Boose stated that when she began working on the project, she was told that

> we would be working very long days (in excess of 12 hours) but that we could only CLAIM 40 hours per week.  No provision has been made to track the additional hours worked, and our department will not receive compensation . . . for these hours.  When I questioned that project lead about why we couldn't get credit for all the hours worked, I was told that this is a "fixed price contract" and that this mandate came down from Manos Menayas, VP of ITS West Region. . . . I am concerned that by not recording the acutal [sic] hours it took to complete a project, future contract bids will be based on incorrect information. . . . I realize that there may be a perfectly good business reason for not tracking the acutal [sic] hours it took to complete a project, but without knowing the "big picture" I thought it would be better to bring it to your attention now, just in case.

(*Id.*, Ex. 2-A, Email from Tamara Boose).

After this email, IBM conducted a six-month investigation into employee time-recording practices on the RPP project.  The investigation was conducted by John Coleman, Process Compliance Manager for Integrated Technology Services, and Adrian Barkan, Business Controls Manager for Integrated Technology Services.  The investigation included several interviews of Stone by both Coleman and Barkan, as well as interviews of Romero; David Grumet, Managing Principal of the MSCE Practice; and a number of the employees who worked on the RPP contract.  Coleman interviewed Stone once, and Barkan interviewed

him three times.  Coleman and Barkan have submitted affidavits and interview notes stating

that Stone admitted telling Romero and Grumet to direct their employees to record only forty

hours a week on the RPP contract, regardless of the actual time they worked.  (Docket Entry

No. 29, Ex. 3, Coleman Decl. ¶ 7; *id.*, Ex. 2, Barkan Decl. ¶ 8).  Romero and Grumet also

told Coleman and Barkan that Stone had given them this order and signed written statements

to this effect.  (*Id.*, Ex. 3, Coleman Decl. ¶ 7; *id.*, Ex. 2, Barkan Decl. ¶ 9; *id.*, Ex. 6-A, RPP

Investigation Report).

   The investigation produced a detailed report dated September 20, 2002.  The report

began with an investigation summary that included the following conclusions:

> Perform personnel were told to falsify records by recording only
> 40 hours per week regardless of time worked
>> Stone verified that this direction was given by Menayas
>> Romero confirmed that this direction to record
>> only 40 hours work was given by Menayas
>> Forrest confirmed that Menayas wanted people to
>> only record 40 hours/week regardless of time
>> worked
> Menayas (terminate) denied that he had given these instructions
> – lied to investigator
> Stone (terminate) had instructed PM's and PE's to pursue this
> practice
>> He had instructed management to put in practice
>> to have people lie about their time worked
>> Met with Grumet to set the practice into action
>> outside region 11
> Grumet (terminate), Managing Principle [sic] of the MCSE
> practice, had agreed to the practice to lie about their actual time
> worked

(Docket Entry No. 29, Ex. 6-A).  The report recommended that Menayas, Stone, and Grumet

be fired because they "directed personnel working on the RPP project to keep contract costs

4

down by capping the number of hours recorded as worked.  As a result, employees were forced to falsify their labor records in the IBM CLAIM system related to labor invested in the contract." (*Id*.).  The report listed other adverse effects of the management directive to falsify hours.  The report also contained summaries of the numerous interviews of employees who stated that they had been given the directive to falsify their hours.  The report described an interview of Stone confirming that Menayas had given the instruction and he had carried it out.  (*Id*.).  The managers who directed the employees not to record actual hours worked violated  IBM's Business Conduct Guidelines ("BCG").[3]  IBM employees regularly certify that they have read and understand the BCG and agree that compliance with the BCG is a condition of employment.  (Docket Entry No. 29, p. 4).

The summary judgment record also contained notes of interviews of other employees; affidavits and declarations from those involved in the investigation and in the decision to fire Menayas, Stone, and Grumet; and a copy of IBM's policy requiring employees to keep accurate records and forbid falsification.  The summary judgment record provides evidence of the information IBM had that Stone instructed Grumet to instruct his employees not to record more than forty hours in a week.  Stone admitted in his affidavit, and the record shows, his efforts to get a "nonbillable" number separate from the contract to track the

---

[3] Section 3.6 of the BCG provides: "You must record and report all information accurately and honestly.  Every employee records information of some kind and submits it to the company. For example: an engineer fills out a product test report; a marketing representative reports orders; an accountant records revenues and costs; a scientist prepares a research report; and, a customer engineer completes a service call report.  Each employee must accurately and honestly fill in reports."  (Docket Entry No. 29, p. 4 n.1).

employees' hours in a way that would not count toward the total hours for RPP.  (Docket Entry No. 31, Ex. A, Stone Affidavit ¶ 6; Docket Entry No. 29, Ex. 7, Willim Decl. ¶¶ 4–5).  Because overtime hours were not recorded, IBM had inaccurate records as to the labor costs on the contract and employees working on the RPP contract were unable to be compensated for the overtime they were working.

Barkan submitted his written report to Mike Wiley, the General Manager for IBM Technology Services Americas, recommending that Menayas, Stone, and Grummet be fired.  Wiley asked Barkan to interview Stone, Menayas, and Grumet again; Barkan did so and reported the same conclusions.  (Docket Entry No. 29, Ex. 6. Wiley Decl. ¶¶ 4–5).  Wiley fired Menayas, Grumet, and Stone within four days of each other.  After he was fired, Stone submitted an appeal in which he admitted to trying to open a nonbillable number that would not flow to the RPP contract and to trying to avoid "showing costs" to the RPP contract. (Docket Entry No. 29, Ex. 5-A,  *id.*, Ex. 1-A, Stone Dep. at 87:1–6).  Stone's termination for directing employees to commit fraud was upheld.  (*Id.*, Ex. 5, Wells Decl. ¶ 9).

Stone filed suit in October 2003 in Texas state court, alleging violations of the Texas Commission on Human Rights Act.  He alleged that he had been fired because of a disability or perceived disability resulting from his October 2001 head injury and in retaliation for engaging in a protected activity.  In the response to the summary judgment motion, Stone asserted that he has presented evidence of disability, consisting of limits on his ability to work and live including "short-term memory loss," and disparate discipline, because others involved in the scheme were not fired.  Stone asserted that he raised a fact issue as to

6

retaliation by stating in his affidavit that he offered to show Barkan additional documentation to explain the billing procedure on the RPP and why it did not violate policies or procedures, but Barkan refused to examine the documents.  (Docket Entry No. 43, Ex. A, Stone Aff.).

## II.   The Applicable Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id*.

The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.     The TCHRA Claims**

The TCHRA parallels the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and courts "'look to analogous federal precedent for guidance when interpreting the Texas Act.'" *Rodriguez v. ConAgra Grocery Prods. Co.*, No. 04-11473, 2006 WL 45857 (5th Cir. Jan. 10, 2006) (quoting *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)); *see also McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 463 (5th Cir. 2005) ("[T]he TCHRA parallels federal discrimination laws."). One of the express purposes

of the TCHRA is to "provide for the execution of the policies embodied in . . . the Americans with Disabilities Act of 1990."  Tex. Lab. Code. Ann. § 21.001(3) (Vernon 1996).  To set forth a *prima facie* case of disability discrimination under the TCHRA, a plaintiff must plead facts showing that he is a "qualified individual" with a "disability" as defined by the TCHRA and that an adverse employment decision was made because of the disability.  *See Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999).

Under the TCHRA, a person is disabled if he "either (1) is actually disabled, (2) is regarded as being disabled, or (3) has a record of being disabled."  *Dupre v. Charter Behavioral Health Sys.*, 242 F.3d 610, 613 (5th Cir. 2001).  The ADA and the TCHRA define "disability" as "a mental or physical impairment [which] must substantially limit an individual's ability to perform at least one major life activity."  *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003).  Whether an individual suffers from a disability must be determined on a case by case basis.  *Albertson's, Inc. v. Kirkingberg*, 527 U.S. 555, 556 (1000).  "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA."  *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995).  Whether an impairment is substantially limiting depends on "its nature and severity, its duration or expected duration, and its permanent or expected permanent or long-term impact."  *Dupre*, 242 F.3d at 614; *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004).  "'Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.'"  *Bennett v. Calabrian Chems.*

9

*Corp.*, 324 F. Supp. 2d 815, 827 (5th Cir. 2004) (quoting *Pryor v. Trane Co.*, 138 F.3d 1024,

1026 (5th Cir. 1998).  Major life activities includes "'functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working.'"  *Bennett*, 324 F. Supp. 2d at 826 (quoting *Talk v. Delta Airlines, Inc.*, 165 F.3d

1021, 1024–25 (5th Cir. 1999)).  "[A] plaintiff must prove a substantial limit with specific

evidence that *his particular* impairment substantially limits *his particular* major life activity."

*Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003).

Section 12112(a) of the ADA states:

> No covered entity shall discriminate against a qualified
> individual with a disability because of the disability of such
> individual in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee
> compensation, job training, and other terms, conditions, and
> privileges of employment.

42 U.S.C. § 12112(a).  Section 12112(b)(5)(A) states that discrimination includes:

> not making reasonable accommodations to the known physical
> or mental limitations of an otherwise qualified individual with
> a disability who is an applicant or employee, unless such
> covered entity can demonstrate that the accommodation would
> impose an undue hardship on the operation of the business of
> such covered entity[.]

*Id.* at § 12112(b)(5)(A).  The Fifth Circuit has stated that "[i]n general . . . it is the

responsibility of the individual with the disability to inform the employer that an

accommodation is needed."  *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th

Cir.1996) (quoting 29 C.F.R. § 1630.9, App. (1995)).  Once such a request has been made,

"[t]he appropriate reasonable accommodation is best determined through a flexible,

interactive process that involves both the employer and the qualified individual with a disability." *Taylor*, 93 F.3d at 165 (quoting 29 C.F.R. § 1630.9, App. (1995)).  It is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.  *Taylor*, 93 F.3d at 165.

If the plaintiff makes a *prima facie* showing of a disability-based adverse employment action, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003)*; Sherrod v. Am. Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998).  If the defendant satisfies this burden, the plaintiff must show that the proffered reasons are pretextual. *Gowesky*, 321 F.3d at 511.  The question on summary judgment is whether there is a conflict in substantial evidence to create a jury question as to discrimination based on a disability. *See Gowesky*, 321 F.3d at 512.  If the claim reaches the pretext stage, the issue is whether the totality of the evidence, including the evidence raised at the *prima facie* case and pretext stages, raises a genuine issue of material fact as to whether defendant fired plaintiff because of a reason prohibited by the ADA.  The issue is whether the evidence, viewed in the light most favorable to the plaintiff, creates a jury question regarding the discriminatory termination claim.  *See Calbillo*, 288 F.3d at 725; *Anderson*, 477 U.S. at 255.

Title VII declares that "[i]t shall be an unlawful employment practice for an employer to discriminate" against an employee "because he has made a charge" of discrimination.  42 U.S.C. § 2000e-3(a).  A *prima facie* retaliation claim has three elements: "'(1) the employee

must have engaged in an activity protected by Title VII; (2) the employer must have subjected the employee to an adverse employment action; and (3) a causal nexus must exist between the plaintiff's participation in the protected activity and the adverse employment action.'" *Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969, 972 (5th Cir. 1999) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir. 1997)); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407–08 (5th Cir. 1999).

**III.   Analysis**

**A.   Disability**

Stone asserts that the record raises a fact issue as to whether the head injury he sustained in December 2001, ten months before he was fired, made him disabled under the ADA and TCHRA.  Stone contends that the effects of that injury left him substantially limited in the major life activities of learning and working.  (Docket Entry No. 31, p. xi).  Evidence of substantial limitation in the major life activity of learning requires a showing of difficulty in learning new material, that others do not experience.  *See Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 497–98 (10th Cir. 2000); 29 C.F.R. § 1630(j) (2002).  Evidence of substantial limitation in the ability to work requires a showing that an impairment "precluded [plaintiff] from a class of jobs or a broad range of jobs." *Dupre*, 242 at 614; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Pryor v. Trane*, 138 F.3d 1024, 1027 (5th Cir. 1998).

12

Stone asserts that even after February 14, 2002, he suffered from occasional short-term memory loss, headaches, loss of smell, and a reduced ability to deal with hunger, heat, and stress. (Docket Entry No. 29, Ex. 1-D, Interrog. No. 15). There is no evidence in the record to raise a fact issue that these symptoms affected Stone's ability to learn or work so as to amount to a disability. In December 2001, Stone was released to work with mild restrictions. On February 14, 2002, Stone was fully released to return to work, with no restrictions or limitations. The record shows that he performed his job tasks without apparent difficulty. Five months after he returned to work following his head injury, IBM assigned Stone significant additional territory and management responsibility and recognized him for the quality of his work. (*Id.*, Interrog. No. 7). The record shows that Stone was able to perform a range of activities without accommodation, including working, driving, and using a computer. (*Id.*, Ex. 1-A, Stone Dep. 50:13–51:24). Stone did not ask for accommodation in the tasks assigned him, the way in which he was to perform his work, or in the conditions of the workplace. After losing his job at IBM, Stone found employment at DANKA Office Imaging as a consultant with responsibilities that included managing "call centers," earning $4,000 per week. The fact that a discharged employee finds employment supports an inference that he is not restricted from performing a broad range or class of jobs. *Dupre*, 242 F.3d at 615; *Hamilton*, 136 F.3d at 1051; *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993). Stone has not raised a fact issue as to whether he was or is substantially limited in his ability to learn or to work in his job, much less in a broad range of jobs. *See Waldrip*, 325 F.3d at 656 (5th Cir. 2003) (quoting *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187 (5th Cir.

1996)) ("[C]ancer and its treatment did not substantially limit the major life activity of work. 'Obviously, plaintiff's ability to work was affected; but . . . *far more is required* to trigger coverage under [the ADA].'").

Stone argues that he is "disabled" under the TCHRA because IBM regarded him as disabled.  (Docket Entry No. 31, p. x).  He contends that IBM was "aware that Stone had fallen, hit his head and was in the hospital."  (*Id.*, p. xi).  Stone notes that IBM received the diagnosis and restrictions that were placed on him.  (*Id.*).  Both the ADA and the TCHRA permit suits by plaintiffs who are not actually disabled but are "regarded as having such an impairment."  Tex. Labor Code Ann. § 21.002(6); *see also Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997).

> One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.

*Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 508 (5th Cir. 2003).  "[A]n employee is also regarded as having a substantially limiting impairment if his employer mistakenly believes the employee (1) has a physical impairment that substantially limits on or more major life activities, or (2) an actual, non-limiting impairment substantially limits one or more major life activities."  *Haggar Apparel Co. v. Leal*, 100 S.W.3d 303, 309 (Tex. App.–Corpus Christi 2002, pet. filed).

A jury could not reasonably find that Stone was regarded as disabled.  Stone's doctor released him to work without limitation or restriction as of February 14, 2002.  (*Id.*, Ex. 2).  The doctor's medical treatment report that released Stone to work without restrictions as of February 14, 2002 checked "Yes" for the questions, "Is the employee able to perform work of any kind?" and "Is the employee able to perform the essential functions of his/her position? (Answer after reviewing statement from employer of essential functions of employee's positions, or, if none provided, after discussing with employee.)" (*Id.*).  Question four of the medical treatment report stated: "If this patient NEEDS LIMITATIONS, AS ABOVE, OR IS UNABLE TO RETURN TO WORK, indicate medical reason.  BE SPECIFIC."  Stone's doctor wrote, "N/A."  (*Id.*).

When Stone returned to work full-time, without restriction, on February 14, 2002, IBM did not treat him as having any limitations.  IBM did not change his job to reduce his responsibilities.  To the contrary, IBM added responsibilities and territory and recognized the quality of his work performance five months after the injury.  Stone has not produced any evidence that IBM questioned his ability to handle his job because of his injury.  "For an employer to regard an impairment as substantially limiting work, the employer must regard an individual as significantly restricted in his ability to perform a class or broad range of jobs." *Hamilton v. Sw Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998); *see also Bennett*, 324 F. Supp. 2d at 833 (employer did not regard employee as "substantially limited" when employee remained employed after his three heart surgeries and continued to have all of his previous job responsibilities and duties following those surgeries).  An employee "cannot

15

succeed on the 'regarded as disabled' element of [a disability] claim when [his] employer never limited [his] job duties or hindered [his] return to the full range of duties." *Gowesky*, 321 F.3d 503, 508 (5th Cir. 2003).

Stone has not presented any evidence that IBM regarded him as unable to perform his job; he has merely shown only that IBM knew of Stone's injury, recovery, and return to work.  There is no basis for an inference that IBM regarded Stone as disabled.  *See Dupre*, 242 F.3d at 616 (employer's awareness of employee's back injury, back surgery, and fact taking pain medication did not show that employer regarded employee as substantially impaired).

### B.    A Legitimate, Nondiscriminatory Reason and Pretext

Stone has not made a *prima facie* showing of case of disability under the TCHRA. Even if he had made that showing, IBM has met its burden of articulating a legitimate nondiscriminatory reason for the decision to fire Stone: the determination, after investigation, that he was part of an effort to falsify records of time worked on the RPP contract.  Stone has failed to raise a fact issue as to whether this reason was pretextual.

Stone does not dispute the extensive investigation into the complaint that employees working on the RPP contract were directed to falsify their reported hours to inflate the appearance of profitability.  The summary judgment evidence includes reports of interviews and documents assembled and analyzed in that investigation and the detailed report that resulted.  Stone asserts that during one of the interviews he gave, he explained that he had some short-term memory loss and offered some documents that he said would have explained

16

the billing procedures and why they were not improper.  Barkan allegedly refused to look at the documents.  Stone also argues that most of the employees who falsified their records reported to another IBM executive, Ron Forrest, who, with another executive, Warren Weller, knew about the costing and billing procedures associated with the RPP contract, but were not fired.

In discriminatory discharge cases based on an employee's alleged violation of a "work rule," the employee "may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'"  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)); *see also Simmons v. Rothe Dev., Inc.*, 952 F. Supp. 486, 490 (S.D. Tex. 1997), *aff'd*, 132 F.3d 1456 (5th Cir. 1997).  To state a *prima facie* case based on disparate discipline, the employee "must show that [noncomplaining] employees were treated differently under circumstances 'nearly identical' to his."  *Mayberry*, 55 F.3d at 1090 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)); *see also Simmons.*, 952 F. Supp. at 490; *Lee v. Georgia-Pacific Corp.*, 944 F. Supp. 497, 501–02 (S.D. Miss. 1996) (both holding that plaintiff could not prove his case of disparate discipline after admitting to violating the work rule and then failing to prove that employees outside the protected class were treated differently).

Stone cannot make a *prima facie* showing of discrimination.  Fifth Circuit precedent holds that "a mistaken but good-faith belief that an employee has violated the employer's

rules is sufficient to rebut the *McDonnell Douglas* inference that the employee was discharged for impermissible reasons." *Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1298 (5th Cir. 1981) (citing *Corley v. Jackson Police Dep't*, 566 F.2d 994, 1003 n.14 (5th Cir. 1978); *Turner v. Tex. Instruments, Inc.*, 555 F.2d 1251, 1256–57 (5th Cir. 1977); *Jeffries v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980)).   Under the *Mayberry* test, Stone must show either that he did not violate the posted rule or that, if he did, similarly-situated employees outside the protected class who falsified documents were punished less harshly.  *Mayberry*, 55 F.3d at 1090; *see also Simmons*, 952 F. Supp. at 490. Stone appears to deny that he violated a work rule and to assert disparate discipline.  The evidence does not give rise to disputed fact issues on either argument.

The evidence shows that, as a matter of law, IBM had a reasonable, good-faith basis to believe that Stone had violated the work rule.  The investigation was extensive, detailed, and included Stone's own admissions of culpable involvement.  The record also shows that, as a matter of law, there was no disparate discipline.  IBM fired the two other senior executives who specifically instructed their subordinates to record hours in a false and fraudulent fashion.  Menayas and Grumet were fired along with Stone; neither is disabled. The record shows no basis to conclude – or to show that IBM concluded – that Forrest and Weller also instructed their employees to report false records as to time worked.  (Docket Entry No. 29, Ex. 2, Barkan Decl.; *id.*, Ex. 6-A, RPP Investigation Report).  Forrest and Weller were not, as a matter of law, similarly situated to Stone as necessary to support an inference of disparate discipline.  *See Aldrup v. Caldera*, 274 F.3d 282, 287 (5th Cir. 2001).

18

### C.     Accommodation

Stone appears to argue that IBM retaliated against him for requesting an accommodation. Stone bases this argument on one of the interviews with Barkan during the investigation. Stone allegedly asked Barkan to look at additional documents to explain the billing procedure on the RPP contract, explaining that Stone had a short-term memory loss. Barkan allegedly refused. Stone asserts that IBM fired him in retaliation for requesting this "accommodation."

An employer's duty to provide a reasonable accommodation "arises only when the individual is [actually] disabled; no such duty arises when the individual merely is 'regarded as' being disabled." *Columbia Plaza Med. Ctr. of Fort Worth Subsidiary L.P. v. Szurek*, 101 S.W.3d 161, 169 n.4 (Tex. App. 2003, pet. denied). This court's determination that Stone does not have a disability within the meaning of the TCHRA is fatal to any claim for failure to provide a reasonable accommodation. *See Blanks v. Sw. Bell Commc'ns, Inc.*, 310 F.3d 398, 402 (5th Cir. 2002) (analysis of reasonable accommodation is unnecessary when plaintiff is not protected by the ADA).

Even if Stone had shown a *prima facie* case of disability, he has not raised a fact issue as to a failure to accommodate or retaliation for requesting accommodation. The ADA provides:

> The term "Reasonable Accommodation" may include–
>
>> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

>    (B) job restructuring, part-time or modified work
>    schedules, reassignment to a vacant position, acquisition or
>    modification of equipment or devices, appropriate adjustment or
>    modifications of examinations, training materials or policies, the
>    provision of qualified readers or interpreters, and other similar
>    accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); *see Bennett*, 324 F. Supp. 2d at 835.   The regulations define

"reasonable accommodation" as "[m]odifications or adjustments to the work environment,

or to the manner or circumstances under which the position held or desired is customarily

performed, that enable a qualified individual with a disability to perform the essential

functions of that position."   29 C.F.R. § 1630.2(o)(1)(ii); *see also U.S. Airways*, 535 U.S. at

417; *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001).   A *prima facie*

case requires some showing that an accommodation of the disability exists and is reasonable.

*Bennett*, 324 F. Supp. 2d at 836; *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir.

1996).   The burden then shifts to the defendant to show that the proposed accommodation

is unreasonable.   *Bennett*, 324 F. Supp. 2d at 836.

Barkan's alleged refusal to examine documents during an interview that was part of

the investigation explains why his actions did not violate IBM's policies was not a refusal

to provide the type of accommodation required by the ADA and TCHRA.   Answering

Barkan's questions was not part of the "essential functions of [Stone's] position," but rather

part of an investigation into alleged improper conduct.   Stone gave two other interviews in

the investigation.   There is no showing that during the six-month investigation, Stone was

precluded from providing information to IBM.   Stone has failed to make a *prima facie*

showing of a failure to accommodate.

20

Finally, there is no evidence to raise a fact issue as to retaliation for requesting accommodation.  There is no showing that Stone engaged in protected activity when he asked Barkan to look at some documents during an interview.  There is no showing of any causal connection between this request and the decision to fire Stone.  Even if Stone could make a *prima facie* showing, IBM has met its burden of showing a legitimate, nonretaliatory reason for firing Stone, and Stone has failed to raise a fact issue as to whether the proffered reason was a pretext for retaliation.

## IV.     Conclusion

IBM's motion for summary judgment is granted.  Final judgment will be entered by separate order.

SIGNED on February 16, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge